L.P., L.P., I'm sorry, et al. v. Ruben Ramos, et al. We'll hear first from Mr. E. Todd Smith. Good morning, and may it please the Court. My name is Todd Smith. I'm here on behalf of the appellants, who are the artists in this case. This dispute has a long history, and these parties have a long history with each other. Before you start, I know Mr. Showalter filed a brief, and he's not appearing, obviously, today. You're handling it for everyone? I'm handling it for everyone. All right. That's correct, Judge Barksdale. Fortunately, we don't have to get into the history here today. I'm here to address two really rather procedural points with the Court. One is whether the district court's ruling on standing was correct. This was a 12C ruling on pleadings and also based in part on judicial notice. And secondly, whether the district court's summary judgment on Mr. Ramos' state law claims was proper. Addressing first the 12C issue, the ultimate question on the 12C matter is whether the claimants lacked standing because they assigned away not only 50% interest in their claims to Mr. Showalter, but also an exclusive right to enforce those interests. The record company, Hacienda, we'll refer to them as the record company for short, or just Hacienda, asserts collateral estoppel on appeal and says that in the Guajardo case that's cited throughout the briefs, that Judge Gray Miller from the Southern District, his ruling in Guajardo is now a final judgment and therefore ought to be given collateral estoppel or preclusive effect. The district court, Judge Ramos in this case, said no. The timing of it was such that there was not a final judgment at the time that Judge Ramos was being asked to rule on this 12C motion to dismiss. But that admittedly, the court could take judicial notice if it chose and take a look and see that Judge Miller did in fact ultimately render or enter a final judgment in this case. Now, from the perspective of the artist, this use of collateral estoppel is sort of novel. The district court said no because there was no final judgment. The case went up on appeal before a final judgment was rendered and now the record company is asking the court to bind over the artist in this case to Judge Miller's ruling even though it didn't occur until after. The court's approach generally to essentially adding to the record on appeal is not to do it. The court generally does not enlarge the record. It would actually require, as I mentioned, further judicial notice from this court to even get to where Hacienda wants to go on collateral estoppel. And we found no cases in which this court has actually followed the procedure that the court is being asked to follow here. That is that ultimately the same procedural posture. There's a final judgment that's not rendered until the district court's final judgment Excuse me. There's a final judgment that follows the district court's final judgment in the present case trying to bind over collateral estoppel in another case. We don't think this is a proper use of collateral estoppel. We think the court has to view or should view the case as it exists at the time the district court enters final judgment. So for that reason, we would urge the court not to apply collateral estoppel in this case. But you admit that we can take judicial notice of Judge Miller's ruling, his opinion, in a case that was settled during appeal. There is a final judgment, and there's nothing that precludes our applying a collateral estoppel other than you say our court has been loath to do it in those circumstances. Well, I wouldn't say loath. First of all, yes, you're correct, Judge Barksdale. But I wouldn't say loath to do it. I would say that it just hasn't been presented with the situation, or if it has, it hasn't written about it. It would be unusual, to say the least, though, for a court, this court, to take judicial notice of something that happened before the district court, after the district court ruled, rather. How are the claims different in this case as opposed to the Guajardo case, such that they are essential to judgment here or of controlling significance? I would say that they're not essential to the judgment. It's really an issue, and it has to do strictly with the standing issue. In fact, Guajardo was taken up on appeal and ultimately settled as part of a bankruptcy that one of the artists went through. And so our position is, you're drilling deeper into a point that I should make, that it's really only the issue of standing that could be collaterally, we could be collaterally stopped on that issue, because there are copyright claims and other claims, I believe, in the Guajardo case that aren't present in this case in the form that it's gone up on appeal. Right. And that leads into the next question I wanted to ask you. In the present, the case we've got here, we'll call it Ramos, as I understand it, only one of the appellants here, Juana Hato, if that's the way to pronounce it, asserted any sort of copyright infringement claim. Is that correct? I believe that's correct. I know that's true as far as what cases are left, what cases were left at the time that Judge Ramos entered her final judgment. Juana Hato, I think, was the only one that had a copyright infringement claim and also a Digital Millennium Copyright Act claim that were still pending at the time of Judge Ramos' judgment in this case. The other three plaintiffs waived the infringement claims, correct? They were voluntary dismissals, and so I believe that's correct, Judge Clement, yes. The other three simply have essentially state law claims, breach of contract, breach of fiduciary duty was asserted by two of them, I believe, Guerrero and Serrata, and then also there was a claim for breach of good faith and fair dealing, which was disposed of on certainly judgment and hasn't been appealed, and also a claim for attorney's fees under Texas law, which would follow the breach of contract claim. So, all right. But one of our points, aside from collateral estoppel. You're saying that Juana Hato's copyright, whatever his infringement, copyright infringement claim, you say they're still alive. In other words, they weren't voluntarily dismissed or anything of that nature? In the order of voluntarily dismissing a number of claims, Mr. Juana Hato did retain, if memory serves, his copyright and digital millennium copyright claims. Correct. And those would arguably be the only ones where it could be asserted that the claim, the assertion could be made that, well, for those type claims, you have to specifically state we're giving up any, we're assigning to our lawyer any right to prior copyright infringements. As I understand it, that's perhaps the only issue on the standing question is, do the assignments apply to any prior claim under the copyright law? And only one appellant has any copyright claim still in this case. I think Judge Ramos's order, the order on the standing issue in this case, can be read much more broadly than that, Judge Barksdale. But it's de novo review. We're not bound by her ruling. But we're talking about state law claims. And, in fact, the other case that's referred to a lot in the brief is the Sanchez case, also from the Houston area. And if you look at that case, the analysis starts out not with copyright act. Are we going to apply some accrued claim rule under the Copyright Act? The case starts out looking at, under Texas law, what does an assignment do? And we have assignments that were issued under Texas law. There's no dispute that, in terms of construing the assignments as contracts, that Texas law applies. And Judge Rosenthal and Sanchez said, well, you have to look and see what the language says. And if it doesn't, it basically tracks where I think you're going with this, Judge Barksdale, which is under the Copyright Act and under copyright law generally, prior existing claims don't travel with the assignment. Unless they're expressly assigned. Agreed. I mean, I don't think it has to go into great specifics. It may not. But we have here the issue of whether the court in Guajardo, which Judge Ramos essentially just duplicated the analysis from Guajardo, because the same agreements were at issue. We have the issue, did the claims exist before the assignment was made? And I know we've demonstrated in our brief, I believe it's in footnote five, that these claims were filed and did exist before the assignment was made, or they at least existed before the assignment was made. Going back to the Sanchez District Court opinion, we think the law is basically the same, Texas law versus the Copyright Act. So we don't think that there's any meaningful distinction in terms of where do you draw the line on when the claim rises. Under the Copyright Act, you recited the law, Judge Barksdale. The same analysis applies under state law. In fact, Judge Rosenthal looked at this language, a very similar language, any and all claims, and said that the mere assignment of any and all claims doesn't include claims existing before the date of the assignment. See, that doesn't make sense. When you give up any and all claims, not only are you thinking about what might arise in the future, but just common sense-wise, you're thinking about claims you already have. And again, I know we'll just have to look at the law, but I'm not sure the law is as strong as you're urging us to believe. Essentially, from our perspective, we're looking at it this way. You've got Guajardo on the one hand. You've got Sanchez on the other hand. They're construing not identical agreements, but very similarly worded agreements that contain the phrase any and all. If you look at the way that Judge Rosenthal reasoned it in Sanchez, she concluded expressly any and all, just like in the case of the Copyright Act, without that express language carving out prior, heretofore prior claims, whatever the magic words are that are cited in the cases, it applies exactly the same and means that the prior accrued claims don't transfer. It's obviously up to the court to determine whether the Guajardo court got it right or whether the Sanchez court got it right. We think the Sanchez court has the better analysis. In fact, if you look at the actual one distinguishing factor, of course, is this special power of attorney that was executed in favor of Mr. Showalter, which was really the crux of the district court's analysis here. I don't think even the district court would say, in this case would have said the assignment power of attorney by itself conveyed such exclusive rights to Mr. Showalter that it was an essential party and had to either bring suit in his name or do something else. That these plaintiffs actually went so far as to be divested of their right to actually bring the claim. The assignment power of attorney is a pretty unremarkable contingent fee agreement for Mr. Showalter to represent his clients and take an interest in the claims so that he can get paid. Why don't you address the breach of contract summary judgment against Mr. Ramos? I will do that. Thank you. So there were two issues really in the breach of contract matter. The existence of the contract and whether there was a breach of contract. There was some discussion in the district court's opinion about whether the contract existed. We don't think that's really an issue because the same 1985 agreement that the court talks about was actually cited and I think even included in the summary judgment record in the motion filed by the record company. So the record company itself says there's a 1985 agreement in place. It doesn't seem correct to then say, well, the artist, Mr. Ramos, didn't prove the existence of an agreement. It seems rather undisputed, at least from the record company's perspective, that there was an agreement. The real issue that I think the court wants to hear about is the issue of breach and whether this was a sham affidavit or sham declaration that was filed that Mr. Ramos prepared. That doctrine, well, if you look at the declaration for starters, it says outright we have the 1985 contract. It refers to the same contract that the record company refers to, and it says there was a breach. It says I didn't get paid. Okay. The district court in ruling on this issue said, well, that is inconsistent with Mr. Ramos's subsequent deposition testimony. I'd point out to the court that just like or much like the collateral estoppel issue, there is not a single case that I found from this court in which the sham affidavit or sham declaration doctrine was applied to an affidavit or declaration executed before the deposition. There is, just by the dictionary definition of this doctrine, a temporal limitation on the doctrine. A first executed affidavit is not subject to the sham affidavit doctrine because every case from this court explicitly says it only applies to declarations or affidavits executed after a deposition, and that makes a lot of sense. You don't want a plaintiff to be able to avoid some re-judgment in the face of bad deposition testimony simply by executing an affidavit. Maybe you don't find any case law because it's a pretty extraordinary circumstance that the man files an affidavit and then he gives a deposition and disavows knowledge of the contract. And he's subject to examination, and I'm not so sure it's even not more compelling when you do an affidavit and then you disavow the affidavit in your deposition. Well, I'm not sure that he actually disavowed it. Well, I'm overstating. The claims made in the affidavit in the deposition, as I understand it, and I haven't read the whole deposition, of course, but he's basically disavowing the contract. I wouldn't state it that way. There has to be, according to the sham affidavit doctrine. Don't get all caught up in the sham affidavit doctrine. Just didn't he disavow the contract in the deposition? I would not say disavow. All right. The words used. What do you say? I say exactly what he said. He said he didn't remember. I have to refer back to the sham affidavit doctrine because part of that doctrine is there has to be a clear contradiction between the testimony. Whether there's a temporal limitation or not, there has to be a clear contradiction between testimony A and testimony B. And what the testimony was here that the record company says was contradictory was, I don't remember. I don't remember getting paid. I don't remember getting paid. And what we say is not the same as I was paid or I wasn't paid. What did he say about the contract itself, the 85 contract? He, my recollection is that he also didn't remember getting that. But to go deeper than that, Judge Barksdale, I'm afraid I wouldn't be able to do that. And I see that my time is up. Thank you very much. We're going to have some time on rebuttal. Mr. Rolando Garcia. On the standing issue, Your Honor, I believe you're exactly right. If your rights in copyrights are transferred and assigned, and it says any and all rights, it can only mean any and all rights. What other rights can there be? We had a similar trial in the Guzman case in front of Judge Greg Costa, a very similar issue as well, a transfer of any and all rights to a song. And the court and the jury ruled that that means the rights, all rights, and the copyright to that song. That was also brought by Mr. Showalter. The reason that there is no standing here. Has there been any question raised, and I'm not implying any impropriety, has any question been raised about since Mr. Showalter has these assignments of all claims that maybe he shouldn't be the lawyer and be participating in this case as a lawyer? I'm just asking. We've always wondered how he could do that, whether there was a conflict in our Tempest case. Not only was he the lawyer, he was his own expert witness, and he was the plaintiff himself directly, yet we had that case. It's not for me to say, but that's how he conducts his business. But anyway, Your Honors, what is missing in the fundamental underpinning to copyright law is all of this accrued royalty rule argument is not even relevant. It's not even dispositive here. Why? Because whether you transfer an accrued royalty or whether you transfer prospective royalties, the bottom line is you have to be the owner of the copyright to which that royalty may pertain. Well, here what's been missing, and we put it in our brief, but it's not gotten attention, is that these claimants voluntarily moved to dismiss with prejudice their copyright ownership claims to all these songs. Except one of the appellant? Not true, Your Honor. On that one, what Mr. Guanajuato did was he retained his copyright infringement claim. However, his declaratory judgment action for copyright ownership he dismissed with prejudice. He only retained his declaratory judgment action with respect to the accounting, which was the contract matter. But that's past accounting, right? That was... No future claims. It was not specified either way in the deck action. But how could it exist if he gave up his copyright? What's there to infringe on his? Well, number one, we don't have a contract with Mr. Guanajuato, so that's not even pertinent to him. But as to the copyright ownership claim, they were dismissed, so none of them have standing to bring the claims or to come in here and try to bootstrap and keep standing when it doesn't matter. They no longer can claim ownership in this case. Is this the only case that's left? I mean, there are a lot of these Hacienda records. This is the last one. How many have there been? There have been five, Your Honor. How could this take so long? Well, there have been multiple lawsuits filed at multiple times. And this lawsuit was filed in 2014. We promptly filed a deck action when we got a demand letter from Mr. Ramos stating that we have no right to exploit our own album. And we were thinking, well, how can that be? We have a contract with Mr. Ramos. We recorded that album. We own the copyrights to those sound recordings. There's a big difference between the sound recording and these compositions of these artists. And so then we received a second demand letter. That's when we checked and determined, well, Mr. Showalter was suing the Freddie Records parties on these exact same songs. So collateral estoppel does apply. It's the same issue. It's the same contracts. It's the same claimants. What this is an attempt is a backdoor way to try to undo the Guajardo case. That's totally improper to us because we have permission from some of the Freddie Records publishers. We'd have to bring them back in. And so we think that's totally incorrect. Standing under this Court's precedent, Kitty Hawk, must be determined at the time of filing. And at the time of filing, these assignments had been in place, and it wasn't just the assignments, Your Honors, that talk about accrued royalties or not. That was that coupled with the special power of attorney. It was a notarized document. The word special was on there. There had meaning. You cannot, after you get an adverse judgment, try to change the facts by backdating and entering into new agreements. So these cases that they briefed don't apply where there's been a clarification. This is a wholesale modification, trying to change an assignment where you're transferring copyrights, whether accrued or unaccrued. You're transferring those, and then you lose a motion, and then you try to rewrite that to say, you know, it's not, we're not assigning anything at all. We're undoing the assignment. That's not what happened in Systrunk. That's not what happened in Prather. In those cases, there were some clarifications on, did the accrued, did the transfer include the accrued claim? Here, they're trying to undo the transfer altogether to try to give standing. That's totally improper, and that can't happen. And Moser makes very clear that whether that decision was right or wrong, it's now a final judgment, and it's now non-appealed. Mr. Showalter filed a notice of appeal to this court in the Guajardo case. Knowing we had this dispute in the Ramos case, we had raised the argument of collateral estoppel, and he had said in the lower court case, well, but it's not final yet. Well, but he knew it was about to be final. He himself dismissed with prejudice his appeal making that final. So we've now had three judges pass on this, correctly so. And it wasn't just the assignment where you have the, whether it includes accrued claims or not. It's that coupled with the special power of attorney, which gave Mr. Showalter the exclusive right to bring a claim related to these. And when you say we've had three judges pass on it, we've got Judge Miller in the Guajardo case, and are you including Judge Costa? No. Okay. Who's the other judge? Judge Francis Stacey, the magistrate judge, Judge Francis Stacey entered the first order in the Guajardo case. That order was adopted by Judge Gray Miller, two judges. Well, I don't think we can count the magistrate judges. That's just a recommendation. I thought you were naming a new action. No, Your Honor. I meant Judge Francis. I got two judges. Yeah, two judges. Judge Nelvick and Judge Ramos and Judge Miller. Yes, Your Honor. We've had two judges pass on it, we think, correctly. Now, the Sanchez case was brought up. That's completely unrelated. Different contract, different assignment, different parties. It wasn't this same list of 350 songs. It has nothing to do with the outcome of the standing issue here. Plus, we've already noted that the issue of ownership has already been decided. It wasn't appealed. That issue was not appealed, Your Honors. The issue of ownership of these copyrights was not appealed, and so there's really no standing whatsoever, accrued, unaccrued, whatever you want to call it. Plus, it's totally improper to try to change the facts after you get an adverse ruling, and we think that's improper. And I would refer to the court where Mr. Showalter tried to do this in the Tempest case. He did the same thing when we won that trial. He ended up, he went, a summary judgment in front of Judge Rosenthal. This was a different, one of the other cases, the first one he filed. Mr. Showalter tried to rewrite his agreement there to backdate it many years before our lawsuit. Judge Rosenthal said, you can't do that. And we would ask Your Honors to take notice of the Judge Rosenthal opinion in the Sanchez case, which we think is also on point, that it's totally improper to do that. That would be Tempest v. Hacienda, 2013, Westlaw, 5964516, Southern District of Texas, November 7, 2013. There's another great case. Repeat the number, 5964. 5964516. It's Judge Rosenthal. How do you spell the name of the appellant? Tempest, T-E-M-P-E-S-T, Tempest v. Hacienda Records. Same thing there, rejected there. It properly should have been rejected. But we think what is a really great case for Your Honors that wasn't briefed by either side that we ran into, a 2015 case that's called Optimal Golf Solutions v. Altex Corp., and that is at 2015 Westlaw 93434. And at page 2 of that opinion, same kind of thing, where a party there is trying to enter into a later agreement to change the facts, and the court there says that was Southern District of Texas case, says, quote, Allowing a subsequent assignment to automatically cure a standing defect would unjustifiably expand the number of people who were statutorily authorized to sue. Parties could justify the premature initiation of an action by averring to the court that their standing through assignment is imminent. Permitting non-owners and licensees the right to sue so long as they eventually obtain the rights they seek to have redressed would enmesh the judiciary in abstract disputes, risk multiple litigation, and provide incentives for parties to obtain assignment in order to expand their arsenal and the scope of litigation. Inevitably, delay and expense would be the order of the day. Close quote. We think that's the same principle here, that an after-the-fact assignment cannot cure when Kitty Hawk makes very clear standing is determined at the outset of the case and for good policy reason, Your Honors. Plus, these claimants don't even have copyright ownership rights to even argue accrued rights. And it wasn't a modification, it wasn't a clarification. These later corrective assignments were whole new documents, totally improper, Your Honors. That would be a split with your own precedent to allow that gamesmanship. On the issue of Mr. Guanajuato and the dismissal of his copyright ownership claim, I would direct the court to the court's order. It was a docket entry 166, and that's at the record on appeal, page 6854. And there, Mr. Guanajuato, the order dismisses with prejudice, quote, portions of his claim for declaratory judgment, period. Guanajuato shall retain his claims for, and as to the declaratory judgment, it says, that claimants are entitled to an accounting for all revenue and profits from Hacienda's exploitation of the works. Close quote. If you look at that document and then you look at the actual declaratory judgment that was filed, you see, Your Honor, that at record on appeal, page 5956, what Mr. Guanajuato and the other claimants were seeking to declare was, then they put into dispute the ownership of and entitlement to possess and control all rights and all copyrights in the works. That was a dismissal with prejudice against them, and also the entitlement to possess or exploit the works. And again, that claim was dismissed with prejudice against Guanajuato and all the other claimants. And so this backdrew away for them to try to argue. They have standing to bring these copyright claims, and the accrued royalty rule just does not even apply, Your Honors. Is Mr. Showalter still an attorney in good standing in Texas? I assume so. I'm not aware of it otherwise. Does he still participate in this case? Yes, and I thought he was going to be here. I'm surprised he's not here. So this is the first I've known him not participating in a proceeding against Tosina Records. Every now and then he'll send his associate to a hearing, but he and his firm have been participating in the case. I think he's still co-counsel. It's just that Mr. Smith is co-counsel with Mr. Showalter. I've not seen a notice of withdrawal at all, Your Honors. And keep in mind, these documents, these assignments, and these special powers of attorney, these were drafted by Mr. Showalter, a very sophisticated copyright lawyer. He knew exactly what those words were, what they meant, what they transferred, what they didn't transfer. You keep referring to him as practicing showmanship, so I just wondered whether there were any claims against him for professional malfeasance. I don't have personal knowledge of that. I do know that some of the other claimants, like Mr. Sanchez, fired Mr. Showalter, and I don't know what disputes have come of that. Mr. Showalter dismissed with prejudice Mr. Sanchez's claims. Didn't retain anything, not even a portion of a deck action. That was a DMCA claim brought in this case, after Judge Rosenthal ruled in our favor on a motion for summary judgment that Mr. Sanchez's claims were time-barred many years ago, just like the claims for Mr. Ramos should be time-barred here. Yet Mr. Showalter sued us for DMCA, and of course under the DMCA you don't have a claim unless you're a copyright owner. So we've been perplexed about this. What has really been horrifying about this case for a small record label, Your Honors, is that when we got these demand letters, unlike the Guzman I case, the Guzman II case, the Tempest case, the Sanchez case, this case was over-the-top different, not only for the infringement claims, but what Mr. Showalter did, he went to some store, bought our CDs that Mr. Ramos had recorded an album, Mr. Serrata recorded an album, et cetera, bought the CDs, put them in a package, filled out a copyright application, sent it in, and claimed to own our sound recordings. We were horrified by that. We had contracts with these artists that we owned the sound recordings. It's typical in the industry. So we had no choice but to file a deck action to determine that we own our own copyrights, and he was suing us for selling our own sound recordings. We pointed that out to Mr. Showalter, you know, these are invalid, and he said— Now, you're getting off the record here. Why don't you deal with the summary judgment against Mr. Ramos? Yes, Your Honor. Especially the sham affidavit ruling. Well, we believe, Your Honors, that it shouldn't matter if the sham affidavit comes before or after a deposition, it's still a sham. Here, what I think is also lost in the totality of the evidence, Your Honors, is that it is true that the sham affidavit here, or sham declaration, came after— or the deposition came after the sham declaration. But these—Mr. Ramos and the other claimants had answered sworn interrogatories on these same topics. So that was before the sham declaration. So you have sworn interrogatory answers, then another set of supplemental sworn interrogatory answers, then you have the sham declaration filed to try for the specific purpose to defeat our summary judgment motion. Then we have four days later a deposition in which Mr. Ramos honestly and candidly answered questions under oath, saying, you know, I can't remember anything, yet four days before he's averring in a written statement that he didn't get paid and that these representations were made to him, and on and on. Completely inconsistent. These go to the heart of the case. They disavow the contract. Oh, yes, there is a contract. I didn't get paid. Yes, I did get paid. I only got paid $1,000. I should have been paid more. I mean, on and on. I didn't know they were selling my product. Yes, I knew they were selling my product from day one, i.e. in 1985. So these are not minor discrepancies like some of the cases they cite. These are major significant inconsistencies that undermine the competency of that affidavit. And the case law is pretty clear. You can only consider competent summary judgment evidence. We would refer the court to U.S. v. Lawrence. It's a Fifth Circuit decision, 276, Fed 3rd, 193. There this court had said that such self-serving allegations are not the type of significant probative evidence required to defeat summary judgment. In BMC Music v. Martinez, 74, Fed 3rd, 87, at page 91 of the Fifth Circuit, again, same holding. Quote, considering that the only evidence in support of the defendant's theory is conclusory, self-serving statement by the defendant, Hugo, the inference that the defendants asked this court to make is unreasonable. Close quote. Last, Thompson v. Gatehouse Media, Louisiana Holdings, same thing, 2008 Westlaw 4534042, same thing. Quote, self-serving affidavits employed to create material facts should be carefully scrutinized by the court. The Fifth Circuit has held that unsubstantiated assertions are not competent summary judgment evidence. Close quote. We think whether it's the sham affidavit comes before or after the depo doesn't matter. We think Your Honors ought to clear up the law on that point. Thank you, Your Honors. Thank you, sir. Ms. Smith. May it please the Court. If this case is viewed as a contract construction matter rather than simply an assignment or what is the effect of this curative assignment that was referred to, a very good case can be made that the Guajardo Court and then by application Judge Ramos here misread the contract, didn't read the whole contract. The special power of attorney itself specifically says that it's revocable. There is a word in another part of the agreement that, yes, says it's an irrevocable right to enforce the agreement. But if the entire agreement is revocable according to its own terms, then I think that undermines the analysis in Guajardo that was borrowed by Judge Ramos in this case. These contracts have to be construed under Texas law, and Texas law requires that a contract be harmonized. And so if you look at the entire special power of attorney and read it alongside the original, that's not a problem. It would be seemingly a fair conclusion to say that what was intended here was not to convey an irrevocable right because otherwise it would render the word revocable, that the entire agreement is revocable, superfluous, and would lead arguably to absurd results, which here we are. We're basing an entire ruling on standing on basically one word or at least a phrase in a document executed after the original contingent fee agreement in this case. So as far as—so I don't think the court even has to get to the curative document. If it reads the agreement and construes it as a whole under Texas law, then standing wouldn't have been destroyed. As far as the sham affidavit doctrine, what happens with interrogatories I don't think is really relevant. The objection that was raised in the district court was this is a sham affidavit. If the record company wanted to object to the affidavit on the basis of its conclusory, its self-serving, those are independent bases for raising objections to affidavits and can be viewed on their own as far as grounds for exclusion. That's not the reason that the district court gave here. The district court's analysis was very narrow. In fact, it only referred to a few snippets of testimony including that this was, in fact, a sham declaration. I would urge the court to review its opinion accordingly. Thank you. Thank you, Mr. Smith.